NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

8th Circuit Court-Jaffrey Family Division
No. 2015-0430


IN THE MATTER OF PAULA GERAGHTY AND KENNETH GERAGHTY

Argued: May 3, 2016
Opinion Issued: October 20, 2016


Bossie & Wilson, PLLC, of Manchester (Jon N. Strasburger on the brief and orally), for the petitioner.


Primmer Piper Eggleston & Cramer PC, of Manchester (Doreen F. Connor on the brief and orally), for the respondent.


CONBOY, J. The respondent, Kenneth Geraghty, appeals from the final order of the Circuit Court (Forrest, J.) in his divorce from the petitioner, Paula Geraghty. He argues that the trial court erred in: (1) applying New Hampshire law to his petition for annulment of the marriage; (2) denying his petition; (3) finding certain testimony proffered by the petitioner credible without explanation; (4) equally dividing the marital estate; and (5) ordering him to transfer to the petitioner one-half of a certain retirement account without affording him the opportunity to address possible adverse tax consequences of that transfer. We affirm.

I.    Background

        The following facts are drawn from the trial court's order, or are otherwise found in the record.  The parties met in 1981 and were married in 1986 in New York.  Shortly after marrying, the respondent moved into the petitioner's New York apartment, where they resided for approximately four years.

        During the marriage, the petitioner stopped working outside the home, and maintained the parties' household by cooking, cleaning, organizing, and doing most of the grocery shopping.  The respondent worked outside the home and served as the sole financial provider.

        In 1990, the parties moved to Massachusetts, where they resided for approximately four years.  In 1994, they moved to New Jersey and purchased a house, which served as their principal residence until 2007.  In 2007, the parties sold their New Jersey house and purchased property in New Hampshire, where, by January 2008, they resided full-time.

        In September 2013, the petitioner filed a petition for divorce.  The petitioner asserted the fault grounds of "conduct to endanger" and adultery as grounds for the divorce.  In February 2015, the respondent filed a petition for annulment of the marriage on the ground that the marriage had been induced by fraud.  During the litigation, he claimed that the petitioner had concealed that she had engaged in prostitution, used illegal drugs, and had certain medical procedures prior to their marriage and that had he known about this conduct he would not have married her.  He also argued that New York law should apply to the petition for annulment because the parties were married under New York law and annulment of marriage concerns whether a marriage is void at its inception.  The petitioner moved to dismiss the annulment petition, which the trial court denied.

        The court held a three-day final hearing on the parties' petitions.  The hearing focused upon three primary issues: (1) the respondent's petition for annulment of the marriage based upon "fraud in the inducement"; (2) the petitioner's claim that the respondent's fault caused the breakdown of the marriage; and (3) the equitable division of the marital estate.

        In May 2015, the court issued a final decree of divorce, ruling that: (1) "New Hampshire law is the appropriate law to be applied in this case"; (2) under New Hampshire law, the petitioner's prostitution and use of illegal drugs prior to the marriage were insufficient to warrant annulment of the marriage; (3) the petitioner's testimony that she had disclosed the medical procedures to the respondent prior to their marriage was credible, and, therefore, the court need not consider this conduct "on the issue of the annulment claim"; (4) the respondent's conduct did not rise "to a level which would sustain a claim of

2

fault grounds of conduct to endanger health or reason"; (5) the respondent had committed adultery with a woman he met "through a website, Sugar Daddys.com," but that the adultery did not cause the breakdown of the marriage; (6) the parties' marriage "did not completely break down until sometime early in 2013"; and (7) equal division of the marital estate is an equitable division. The respondent moved for reconsideration, which the court denied. This appeal followed.

II.     Choice of Law

The respondent first argues that the trial court erred in ruling that New Hampshire law, rather than New York law, applies to the petition for annulment of the marriage. Specifically, he contends that the court erred in its analysis of the five choice-influencing considerations. The petitioner asserts that the court properly applied New Hampshire law to the annulment petition.

We confine our analysis to the arguments presented by the parties. Neither party challenges the trial court's reliance upon the five choice-influencing considerations to determine whether New Hampshire law or New York law should apply to the petition for annulment. We, therefore, assume, without deciding, that such reliance was proper and proceed directly to a review of the trial court's analysis of the five choice-influencing considerations. Because none of the facts relevant to the choice of law issue appears to be disputed, our review is de novo. Cf. Benoit v. Test Systems, 142 N.H. 47, 49 (1997) (conducting de novo review where there was no genuine issue of material fact because parties stipulated to relevant facts for purpose of resolving choice of law question).

The choice-influencing considerations adopted by this court in Clark v. Clark, 107 N.H. 351 (1966), are: (1) predictability of results; (2) maintenance of reasonable orderliness and good relationship among the states in our federal system; (3) simplification of the judicial task; (4) advancement by the court of its own state's governmental interests rather than those of other states; and (5) the court's preference for what it regards as the sounder rule of law. See Ferren v. General Motors Corp., 137 N.H. 423, 425 (1993).

"Predictability of results, the first of our choice-influencing criteria, is usually implicated only in suits involving contractual or similar consensual transactions." Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 17 (1988). "It emphasizes the importance of applying to the parties' bargain or other dealings the law on which they agreed to rely at the outset." Id. "The predictability that results when courts apply the same law wherever suit is brought can also discourage forum shopping among plaintiffs." Id. at 18.

The respondent argues that "[a]t the outset of the parties' marriage, they resided in New York and thus application of New York law and not New

3

Hampshire law would protect the justifiable expectations the parties had when entering their marital contract." We agree that the residence of the parties at the outset of their marriage is relevant to the consideration of the predictability of results.

The respondent also contends that because the parties were married in New York and the alleged fraud which he relies upon to support his annulment petition occurred in New York, "it would have been reasonable for the parties to expect that New York law would be applied to any review of the circumstances that induced the parties to enter their New York marriage contract." We agree.

> To the extent that [parties] think about the matter, they would usually expect that the validity of their marriage would be determined by the local law of the state where it was contracted. In situations where the parties did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be ascertained, it may at least be said that they expected the marriage to be valid.

Restatement (Second) of Conflict of Laws § 283 cmt. b at 234 (1971).

The petitioner argues that "[i]t is unreasonable to conclude that [the] parties would expect that New York law would be applied to the dissolution of their marriage" because: (1) "[t]he parties lived in New York for only three years of their twenty-eight year marriage"; (2) "New York ceased having a substantial connection to the parties when they moved from the state in 1990"; and (3) "New Hampshire courts apply this state's substantive law to divorce actions initiated here even when the litigants were married in another state." The petitioner's argument, however, focuses upon the parties' expectations subsequent to the marriage, rather than at its outset. See Keeton, 131 N.H. at 17.

Accordingly, we conclude that our first consideration — predictability of results — favors application of New York law.

"The second consideration, which counsels maintenance of reasonable orderliness among the States, requires only that a court not apply the law of a State which does not have a substantial connection with the total facts and the particular issue being litigated." Id. at 18 (quotation omitted). Here, the parties were married in New York and resided there for approximately four years immediately thereafter. At the time of the filing of the annulment petition, the parties resided in New Hampshire and had done so for approximately eight years. Accordingly, as the respondent concedes, both states have a substantial connection to the "total facts" of this case and the particular issue of annulment. See id.

4

The third consideration, simplification of the judicial task, see id. at 14, carries little weight in this case. While New Hampshire judges are accustomed to applying New Hampshire annulment law, they could with relative ease apply New York annulment law.

The fourth consideration, the advancement of the forum's governmental interest, "is a significant consideration in a choice-of-law question." LaBounty v. American Insurance Co., 122 N.H. 738, 743 (1982). "Strong policy concerns can underlie local rules, and they sometimes do, but often they do not. In most private litigation the only real governmental interest that the forum has is in the fair and efficient administration of justice." Clark, 107 N.H. at 355. We have stated that "domicile is not enough standing alone to warrant application of New Hampshire law." LaBounty, 122 N.H. at 743.

The respondent argues that "[a]lthough the [trial court] recognized that domicile in New Hampshire was not a sufficient basis upon which to apply New Hampshire law over New York's it erroneously applied New Hampshire law because it concluded the parties were domiciled in New Hampshire." We disagree. In addressing this factor, the trial court stated that "New Hampshire [has] a strong interest in maintaining order in its system of regulating marriage and marital dissolutions." Thus, it is not only the parties' domicile within the state, but also the state's interest in the nature of their dispute that the court relied upon when ruling that New Hampshire has a strong interest in the case.

The respondent also asserts that the court erred in justifying "its application of New Hampshire law based upon the State's interest in the 'protection of offspring'" and "'in ensuring that former spouses will not be destitute and thus a potential drain on the state'" because these justifications are not implicated under the particular facts of this case. We disagree with the respondent's characterization of the trial court's order. See In the Matter of Sheys & Blackburn, 168 N.H. 35, 39 (2015) ("The interpretation of a court order is a question of law, which we review de novo."). At most, the court recognized that such justifications, in general, favor recognizing New Hampshire's governmental interest in the dissolution of its residents' marriages, whether by divorce or annulment, with which we agree. However, the court did not base its decision upon these justifications.

The respondent also maintains that the trial court erroneously relied upon Hemenway v. Hemenway, 159 N.H. 680 (2010). In Hemenway, we affirmed the issuance of a protective order issued against a non-resident defendant in the absence of personal jurisdiction over the defendant to the extent the order protected the plaintiff from abuse. See Hemenway, 159 N.H. at 686-88. In doing so, we acknowledged that:

> Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders. The

5

> marriage relation creates problems of large social importance. Protection of offspring, property interests, and the enforcement of marital responsibilities are but a few of commanding problems in the field of domestic relations with which the state must deal.

Id. at 687 (quotation omitted). Although Hemenway concerned a different issue than that presented here, we find nothing improper with the court's citation to Hemenway to support its ruling that New Hampshire has "a strong interest in maintaining order in its system of regulating marriage and marital dissolutions."

The respondent further contends that because New Hampshire and New York both have "statutory framework[s] governing divorce and annulment proceedings . . . there was no reason to select New Hampshire's statutory divorce framework over New York's to protect New Hampshire's forum interest." Even assuming the respondent's contention is correct, we nevertheless find that New Hampshire's substantial interest in regulating the dissolution of its residents' marriages, whether by divorce or annulment, outweighs any interest New York has in this case. Cf. In re Estate of Wood, 122 N.H. 956, 958 (1982) ("It is clear that New Hampshire has a strong governmental interest in resolving controversies which are closely bound up with its residents and the administration of their estates."). The parties' marriage in New York occurred approximately 29 years before the respondent filed the annulment petition and, at the time he filed the petition, the parties had not resided in New York for approximately 25 years. By contrast, the parties were residents of New Hampshire at the time the annulment petition was filed and had been for approximately eight years.

Upon consideration of all the circumstances, we conclude that this choice-influencing consideration — advancement of the forum's governmental interest — favors application of New Hampshire law.

"The fifth and final consideration concerns our preference for applying the sounder rule of law." Benoit, 142 N.H. at 53. This consideration "can play an important role in the ultimate choice made between the two competing laws." Taylor v. Bullock, 111 N.H. 214, 216 (1971).

> We prefer to apply the better rule of law in conflicts cases just as is done in nonconflicts cases, when the choice is open to us. If the law of some other state is outmoded, an unrepealed remnant of a bygone age, a drag on the coat-tails of civilization, we will try to see our way clear to apply our own law instead. If it is our own law that is obsolete or senseless (and it could be) we will try to apply the other state's law.

6

Clark, 107 N.H. at 355 (quotation and citation omitted).  The determination of which state's rule of law is the sounder rule requires an examination of the policies behind the conflicting rules and a decision as to which represents "the sounder view of the law in light of the socio-economic facts of life at the time when the court speaks."  Taylor, 111 N.H. at 216 (quotation omitted).

Under New York law, "annulments are decreed, not for any and every kind of fraud, but for fraud as to matters 'vital' to the marriage relationship only."  Woronzoff-Daschkoff v. Woronzoff-Daschkoff, 104 N.E.2d 877, 880 (N.Y. 1952) (citation omitted).  The fraud, however, need not go "to the essentials of marriage, that is, consortium and cohabitation."  Id.; see also Shonfeld v. Shonfeld, 184 N.E. 60, 61 (N.Y. 1933).  Rather, "[a]ny fraud is adequate which is material, to that degree that, had it not been practiced, the party deceived would not have consented to the marriage, and is of such a nature as to deceive an ordinarily prudent person."  Shonfeld, 184 N.E. at 61 (quotations and citation omitted).

In New Hampshire, "annulment of a marriage for fraud is granted only with extreme caution."  Fortin v. Fortin, 106 N.H. 208, 209 (1965) (quotation omitted).  "Annulment is not granted for any and every kind of fraud."  Id. (quotation omitted).  Fraud "by one of the parties as to character, morality, habits, wealth, or social position is generally held insufficient" to annul a marriage.  Patey v. Peaslee, 99 N.H. 335, 339 (1955) (quotation omitted).  "Consequently the standard for the annulment of a marriage is both strict and stringent."  Fortin, 106 N.H. at 209.  "The fraudulent representations for which a marriage may be annulled must be of something essential to the marriage relation — of something making impossible the performance of the duties and obligations of that relation or rendering its assumption and continuance dangerous to health or life."  Id. (quotation omitted); see also Jordan v. Jordan, 115 N.H. 545, 546 (1975).

We conclude that our stricter approach to the annulment of marriage upon the basis of fraud is the sounder rule of law for several reasons.  First, annulment of a marriage, which vitiates the existence of the marriage, should not be an easy substitute for legal separation or divorce.  See Fortin, 106 N.H. at 209.  Second, in Heath v. Heath, 85 N.H. 419 (1932), we ruled that so-called "material" fraud, Heath, 85 N.H. at 421, that is fraud "important enough to be a substantial inducement of the marriage," id. at 420, is insufficient to annul a marriage contract.  See id. at 420-33.  We explained that such a "material" fraud rule is

> so broad and general in its comprehensive scope that it leaves
> much to the discretion of the trier and practically each case would
> be largely decided on its own special merits.  The uncertainties and
> discrepancies that would thus arise would produce an

7

unsatisfactory situation both from the public's and the individual's standpoint.

Id. at 421. Finally, we have long recognized that annulment of a marriage contract should be different from the voiding of an ordinary civil contract. See Fortin, 106 N.H. at 210 (explaining that "regulating domestic relations does not permit the marriage contract to be annulled for the same reasons that a mercantile contract may be set aside"). "To give [marriage] contractual treatment generally because it has some contractual aspects is to overshadow the greater importance of its institutional character." Heath, 85 N.H. at 427. As we recognized in Heath, marriage creates "a status containing more than an ordinary contractual relationship and not subject to the ordinary rules of contract law." Id.

The respondent argues that "New Hampshire's law toward annulment actions . . . is outmoded and unduly restrictive whereas New York law is more progressive and developed." He further argues that New York law is the sounder rule of law because it "reflects an emerging national trend that annulment may be granted when the fraud was material to the parties directly affected by the fraud."

We disagree that our law is outmoded and unduly restrictive. Many states employ laws similar to ours. See Janda v. Janda, 984 So. 2d 434, 436 (Ala. Civ. App. 2007) ("Under long-standing Alabama caselaw, a court may annul a marriage because of fraudulent inducement going to the essence of the marriage relation." (quotation omitted)); Wronald S.B. v. Irina P.B., 771 A.2d 978, 980 (Del. Fam. Ct. 2000) ("In interpreting fraud as a basis for annulment, Delaware case law has underscored the statutory language and adhered to the orthodox rule that only such fraud as goes to the very essence of the marriage relation will suffice as a ground for annulment."); In re Marriage of Igene, 35 N.E.3d 1125, 1128 (Ill. App. Ct. 2015) ("The fraudulent representations for which a marriage may be annulled must be of something essential to the marriage relation, of something making impossible the performance of the duties and obligations of that relation of rendering its assumption and continuance dangerous to health or life." (quotation omitted)); Charley v. Fant, 892 S.W.2d 811, 813 (Mo. Ct. App. 1995) (explaining that to annul a marriage "[t]he fraud must be so essential as to create a bar to the marriage"); Guggenmos v. Guggenmos, 359 N.W.2d 87, 91 (Neb. 1984) (fraud sufficient to render a marriage contract subject to annulment must go to "the very essence of the marriage relation" (quotation omitted)); Costello v. Porzelt, 282 A.2d 432, 437 (N.J. Super. Ct. Ch. Div. 1971) (pursuant to statute, fraud sufficient to annul a marriage must go "to the essentials of marriage" (quotation omitted)).

Moreover, to the extent that the respondent argues that our annulment law fails to consider whether the alleged "fraud was material to the parties directly affected by the fraud," we disagree. See Jordan, 115 N.H. at 545-46

8

(determining that superior court erred in denying annulment petition when husband concealed his previous marriage from wife, who was a member of Roman Catholic faith and was prohibited by her faith from marrying a divorced person, and whose health would be endangered by continuance of marriage).

Relying upon our decision in Ferren, the respondent also asserts that New York law should apply because "the 'occurrence' giving rise to [his] annulment request took place in New York." In Ferren, the plaintiff, a New Hampshire resident, brought an action against the defendant for personal injuries allegedly suffered as a result of his exposure to lead dust while employed at the defendant's Kansas plant. Ferren, 137 N.H. at 424. We ruled that New Hampshire law did not apply because, among other things,

> no sufficient grounds exist[ed] on the facts of th[e] case for holding that New Hampshire law provide[d] the better rule. There was no occurrence within New Hampshire giving rise to the underlying suit to which the law of New Hampshire applie[d]. It thereby follow[ed] that this court ought not invalidate the [workers' compensation] statutory scheme of Kansas, whose substantial concern with the problem at hand [gave] it an overriding interest in the application of its law.

Id. at 428. The present case, however, is distinguishable from Ferren. Here, the facts of the marital proceeding establish that the parties maintained the relationship relevant to the petition for annulment — their marriage — in New Hampshire. Thus, although the alleged fraud underlying the respondent's annulment petition occurred in New York, New Hampshire has a significant connection to, and interest in, the parties' marital status as a result of the parties' residence in the state for approximately eight years as of the time the annulment petition was brought.

Finally, the respondent contends that New York law is the sounder rule of law because New York is not alone in recognizing that the failure to disclose past illegal activity is sufficient fraud to warrant annulment of marriage. We acknowledge that some jurisdictions find concealment of a criminal record sufficient to warrant an annulment of marriage. See Douglass v. Douglass, 307 P.2d 674, 676 (Cal. Ct. App. 1957) (annulment granted because "fraud of defendant in concealing his criminal record and true character was a deceit so gross and cruel as to prove him to plaintiff to be a man unworthy of trust, either with respect to his truthfulness, his moral character or a disposition to be a law-abiding citizen"); Haacke v. Glenn, 814 P.2d 1157, 1157, 1159 (Utah Ct. App. 1991) (husband's deliberate and intentional concealment of second degree felony conviction was sufficient to warrant annulment). Nevertheless, for the reasons set forth above, we conclude that our law governing the annulment of marriage upon the basis of fraud is the sounder rule of law.

9

Accordingly, our analysis of the five choice-influencing considerations leads us to conclude that the trial court correctly applied New Hampshire law to the respondent's petition for annulment of the marriage.

## III.    Denial of the Petition for Annulment of the Marriage

The respondent next argues that the trial court erred in denying his petition to annul the marriage.  Relying upon New York law, he asserts that the petitioner concealed her prostitution and use of illegal drugs and that this "was 'material' to [his] consent to enter the marriage and thus he sustained his burden of fraud in the inducement."  Because we have concluded that the court correctly applied New Hampshire law to the annulment petition, we need not address this argument.

To the extent that the respondent also challenges the court's denial of his petition for annulment under New Hampshire law, we find no reversible error.  To obtain an annulment, the respondent had to demonstrate that the petitioner's alleged fraud concerned something essential to the marriage relation; that is, something making impossible the performance of the duties and obligations of that relation or rendering its assumption and continuance dangerous to health or life.  See Jordan, 115 N.H. at 546.  As the appealing party, the respondent has the burden of demonstrating reversible error.  Gallo v. Traina, 166 N.H. 737, 740 (2014).  Based upon our review of the trial court's order, the respondent's challenges to it, the relevant law, and the record submitted on appeal, we conclude that the respondent has not demonstrated reversible error.

## IV.    Credibility Finding

The respondent also argues that the trial court unsustainably exercised its discretion when it "rejected" his testimony that the petitioner failed to disclose, prior to their marriage, that she had had certain medical procedures and instead found credible the petitioner's testimony that she had disclosed this information to the respondent prior to their marriage.  "[W]e defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence."  See In the Matter of Aube & Aube, 158 N.H. 459, 465 (2009).  The trial court "may accept or reject, in whole or in part, the testimony of any witness or party, and is not required to believe even uncontroverted evidence."  Id. at 466.  Although the respondent's testimony conflicted with that of the petitioner's on the disputed issue, the court was not compelled to accept his testimony.  See id.  Accordingly, we conclude that the trial court did not err when it found the petitioner's testimony credible.

The respondent further contends that the court erred in failing to explain the basis for its credibility finding.  Although the respondent claimed in his

motion for reconsideration that the court erred in accepting the petitioner's testimony on the disputed issue, he did not assert that the court erred in not providing an explanation for its credibility finding, nor did he request such an explanation. Accordingly, the respondent has not preserved this argument and we, therefore, decline to address it. See N.H. Dep't of Corrections v. Butland, 147 N.H. 676, 679 (2002) (explaining that, in order to preserve issue, trial court must have opportunity to consider alleged errors and take remedial action).

V.    Equal Division of the Marital Estate

The respondent also argues that the trial court unsustainably exercised its discretion in ordering an equal division of the marital estate. He asserts that equal division was erroneous because: (1) he contributed more to the acquisition of the marital estate and the parties' "relationship was not an economic partnership"; (2) the parties' standard of living did not depend upon certain of his stock proceeds; and (3) certain assets were maintained as his separate property. Thus, he contends that the trial court erred "when it failed to apply the deviation factors in RSA 458:16-a, as those factors support awarding [him] a greater percentage of the marital estate."

"The trial court is afforded broad discretion in determining matters of property distribution when fashioning a final divorce decree." In the Matter of Costa & Costa, 156 N.H. 323, 326 (2007). "We will not overturn a trial court's decision on these matters absent an unsustainable exercise of discretion or an error of law." Id. (citations omitted).

"In a divorce proceeding, marital property is not to be divided by some mechanical formula but in a manner deemed just based upon the evidence presented and the equities of the case." Id. at 327 (quotation omitted). Under RSA 458:16-a, II (2004), "an equal division of property is presumed equitable unless the trial court decides otherwise after considering one or more of the factors designated in the statute." Id. The statute enumerates various factors for the court to consider, such as the length of marriage, the age and health of the parties, the contribution of each party during the marriage which contributed to the growth or diminution in value of property owned by either or both parties, the expectation of pension or retirement rights, whether property is separately held, and tax consequences. See RSA 458:16-a, II(a)-(b), (f), (i)-(j). "Under the statute, the court need not consider all factors or give them equal weight." In the Matter of Costa & Costa, 156 N.H. at 327 (quotation omitted).

Here, the record demonstrates that the court considered the following statutorily enumerated factors: (1) the duration of the marriage; (2) the health of the parties; (3) the actions of both parties during the marriage which contributed to the growth or diminution in value of property owned by either or both of the parties; (4) the direct or indirect contribution made by one party to help educate or develop the career or employability of the other party and any

11

interruption of either party's education or personal career opportunities for the benefit of the other's career or for the benefit of the parties' marriage; (5) the expectation of pension or retirement rights acquired prior to or during the marriage; (6) tax consequences for the parties; and (7) the separate property of the parties.  See RSA 458:16-a, II(a)-(b), (f), (h)-(j).  In considering these factors, the court found that equal division of the marital estate was equitable.

At the time the petitioner filed the divorce petition, the parties had been married for approximately 27 years.  During the marriage, the petitioner supported the respondent by maintaining the marital home, while the respondent supported the petitioner financially.  The court was permitted to rely upon the petitioner's non-economic contributions as the primary homemaker in fashioning the property division.  Cf. In the Matter of Harvey & Harvey, 153 N.H. 425, 439 (2006) (explaining that trial court properly relied upon wife's non-economic contributions as primary homemaker and caretaker for children when fashioning property settlement), overruled on other grounds by In the Matter of Chamberlin & Chamberlin, 155 N.H. 13, 15-16 (2007).

To the extent that the respondent contends that the trial court erred in equally dividing the marital estate because some of the property was acquired solely by him prior to the marriage or near the end of the marriage, we find no error.  "Regardless of the source, all property owned by each spouse at the time of divorce is to be included in the marital estate."  In the Matter of Sarvela & Sarvela, 154 N.H. 426, 431 (2006).  "While the court has discretion to consider when and by whom property was acquired in determining its distribution, the relevant statutory scheme does not classify property based upon when and by whom it was acquired, but rather assumes that all property is susceptible [of] division."  Id. (quotation omitted).

Accordingly, we conclude that the trial court sustainably exercised its discretion when it ruled that an equal division of the marital estate was equitable.

VI.    Distribution of the Respondent's Retirement Account

Finally, the respondent argues that the trial court erred in sua sponte dividing one of his retirement accounts.  In the final decree of divorce, the trial court awarded one-half of one of the respondent's retirement accounts to the petitioner.  It ordered the petitioner to "designate a qualifying retirement account in which to transfer her share of the" account and stated that "[s]hould a [Qualified Domestic Relations Order] be necessary to effectuate this division, it shall be prepared by [the petitioner] at her expense."  The respondent moved for reconsideration asserting, as relevant here, that the transfer of one-half of the retirement account "creates significant detriment to [him] from both a security and tax standpoint for which the Court heard no evidence because neither party requested division of this asset."  He further

12

maintained that the court "acted sua sponte on this issue contrary to the requests of both parties and without the necessary evidence to evaluate the result of its order, thus depriving the parties of presenting evidence on this issue." He, therefore, requested "[t]hat the Court vacate its order for division of [his retirement account] and provide that any such funds be from the transfer of investments selected by [him]." The court denied the respondent's motion.

On appeal, the respondent argues that upon notice that "this division would create adverse tax liabilities the [court] erred when it refused to grant [his] [m]otion for reconsideration, which among other relief, requested the Court grant [him] the flexibility to transfer [an equal amount of funds] from an alternative asset that would avoid any adverse tax liabilities." He also contends that the court's "failure to grant such relief, when it would have had no adverse impact upon [the petitioner] and/or the overall property distribution, was an unsustainable exercise of discretion." He further asserts that the court "order denying [his] [m]otion to reconsider failed to articulate why the . . . transfer could not have been accomplished through an alternative asset when failing to grant such relief will prejudice [him] in the form of additional taxes and penalties." Finally, he maintains that "[a]t a minimum the Court should have granted [him] an opportunity to present evidence of alternative transfers as well as evidence addressing the tax penalties and costs attributable to the court's sua sponte order." The petitioner responds by arguing that the respondent "has failed to demonstrate any tax detriment associated with the division of this account."

We again observe that "[t]he trial court is afforded broad discretion in determining matters of property distribution when fashioning a final divorce decree" and we "will not overturn a trial court's decision on these matters absent an unsustainable exercise of discretion." In the Matter of Costa & Costa, 156 N.H. at 326. A motion for reconsideration "shall state, with particular clarity, points of law or fact that the Court has overlooked or misapprehended." Fam. Div. R. 1.26(F). "We will uphold a trial court's decision on a motion for reconsideration absent an unsustainable exercise of discretion." Broom v. Continental Cas. Co., 152 N.H. 749, 752 (2005).

Here, as the petitioner asserts, the respondent has failed to demonstrate any tax detriment associated with the division of his retirement account. In his motion for reconsideration, he failed to explain or provide any legal support for his assertion that the transfer of one-half of the account to a qualified retirement account in the petitioner's name would result in adverse tax consequences. He likewise failed to set forth what the alleged tax burden would amount to. His appellate brief is similarly devoid of such information.

Although the respondent argues that it was error for the trial court to divide the retirement account in the absence of evidence, he did not seek, in his motion for reconsideration, a hearing or to reopen evidence. Rather, he

13

requested only that the court vacate its order and allow a transfer of other assets in lieu of dividing the retirement account.  Furthermore, we are not persuaded that the court erred in dividing the retirement account because neither party requested such a division in their proposed decrees, but rather proposed that each should keep their respective retirement accounts.  The trial court was not required to accept either party's proposed decree.  Cf. In the Matter of Mortner & Mortner, 168 N.H. 424, 429 (2015) (explaining that, in a dissolution proceeding, trial court has authority to refuse to accept terms of a stipulation).

Accordingly, we cannot conclude that the trial court unsustainably exercised its discretion in ordering division of the retirement account, or in denying the respondent's motion for reconsideration.

Affirmed.

DALIANIS, C.J., and LYNN and BASSETT, JJ., concurred.